Case 1:26-mj-00185-MJS Document 16-2 Filed 10/27/26 Page 1 of 28

## Affidavit in Support of Superseding Complaint

### I. Introduction

1. This affidavit concerns materially false statements made by Nicole FLORIS and Bradley BENAVIDES to the U.S. House of Representatives Committee on the Judiciary in connection with an authorized Congressional investigation into, among other things, the involvement of the Foreign Influence Task Force ("FITF") in various investigations conducted by the Federal Bureau of Investigation ("FBI") into the then-President's son, Robert Hunter Biden ("Hunter Biden"). I make this affidavit in support of a superseding criminal complaint charging FLORIS and BENAVIDES with violations of 18 U.S.C. § 1001(a)(2) (false statements to Congress) and 18 U.S.C. § 1505 (obstruction and attempted obstruction of Congressional proceeding).

2. During the Committee's investigation, Congressional investigators sought information concerning the knowledge of, and involvement in, the investigations into Hunter Biden by FLORIS and BENAVIDES, both of whom were part of the FITF and both of whom the Committee sought to interview in connection with their respective roles with the FITF.

3. On July 19, 2023, FLORIS, and on September 28, 2023, BENAVIDES, despite having been called to testify truthfully before the Committee, and both of whom were sworn to tell the truth in connection with their respective testimonies to the Committee, knowingly and willfully provided materially false statements to the Committee about their respective awareness of and involvement in the FBI's investigations into Hunter Biden, and thereby corruptly obstructed, and impeded and endeavored to influence, obstruct, and impede the due proper administration of the law. As detailed below, those statements are contradicted by documentary evidence, communications, and witness accounts, and concerned matters directly relevant to the

GOVERNMENT EXHIBIT 1

CARDELS 800-783-0399

Congressional investigation.

4. The evidence further establishes that probable cause exists to believe that FLORIS and BENAVIDES made these statements for the purpose of minimizing or concealing FITF's engagement with, and communications about, the Hunter Biden investigations and to impede the Congressional investigation. Accordingly, I respectfully submit that there is probable cause to believe that FLORIS and BENAVIDES violated 18 U.S.C. § 1001(a)(2), by knowingly and willfully making materially false statements in a matter within the jurisdiction of the legislative branch. I also respectfully submit that there is probable cause to believe that FLORIS and BENAVIDES violated 18 U.S.C. § 1505 by corruptly and knowingly influencing, obstructing, and impeding and endeavoring to influence, obstruct, and impede, a proceeding of the United States House of Representatives Committee on the Judiciary.

5. The facts set forth in this affidavit are based at least in part on information I have obtained from my personal involvement in the investigation and from other law enforcement officers who have been involved in this investigation, as well as documents I have reviewed, and on my training and experience. Where I have reported statements made by others or from documents that I have reviewed, those statements are reported in substance and in part, unless otherwise indicated.

6. I am a Special Agent with the FBI and have been so employed since in and around January 2002. In and around May 2002, I was assigned to the FBI Phoenix Division, Sierra Vista Resident Agency where I investigated matters involving public corruption, civil rights, human smuggling, domestic terrorism, and drug trafficking. In and around February 2008, I was assigned to the Kansas City Field Office, where I have investigated matters involving public corruption, financial crimes, and civil rights. Prior to my Sierra Vista RA FBI assignment, I participated in a

five-month basic training program at the FBI Academy in Quantico, Virginia. At the FBI Academy, I received training in investigating federal criminal offenses, interviewing suspects, tactical operations, and firearms. As a Special Agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

## II. Background of the Relevant FBI Investigations into Hunter Biden

7. By late 2019, the FBI's Baltimore Field Office was investigating Hunter Biden for tax and money-laundering offenses. "Sportsman" was the FBI's code name for Hunter Biden. During the course of the investigations into Hunter Biden, there was oversight by FBI headquarter units, including the FITF and the Criminal Investigative Division (also known as the FBI Criminal Division, or "CID"). The purpose of this oversight was to ensure the deconfliction of information related to the ongoing investigations and the dissemination of key case information to FBI leadership. As part of this oversight, one of the primary conduits between CID and the FITF was an FBI CID Unit Chief herein referred to as FBI Employee 1.

8. In October 2026, the FBI interviewed FBI Employee 1. During that interview, FBI Employee 1 confirmed that FLORIS and BENAVIDES were involved in, had discussions about, and had awareness of the Hunter Biden investigations.

9. On December 9, 2019, FBI Baltimore obtained the contents of Hunter Biden's laptop from a computer repair shop where Hunter Biden had apparently left it and, subsequently, searched it as part of the FBI's investigations. *See infra* ¶ 31.

10. In October 2020, at a subsequent meeting, FBI Employee 1 was present when personnel from the FBI's Criminal Division confirmed with BENAVIDES and other members of the FITF that the FBI had obtained the contents of the laptop, that the laptop belonged to Hunter

Biden, and discussed the materials that had been reviewed from the laptop in relation to ongoing criminal investigations.

11. In 2019, according to a subsequent analysis by the Office of Director of National Intelligence ("ODNI"), the FITF informally formed a group of analysts to work on a project later known as "Round River." According to that analysis, the group collected derogatory informant reporting on, among other things, Hunter Biden, to flag the reporting as Russian disinformation.

12. According to an October 2026 interview of FBI Employee 1, when FBI Employee 1 was read in on the Round River project, he was told that the inquiry focused in large part on source reporting in relation to Hunter Biden and the potential for Russian disinformation. The initial interim report—which included the operational plan for Round River—was approved by FLORIS and BENAVIDES.

## III. FLORIS's and BENAVIDES's Respective Involvement with the Relevant Hunter Biden Investigations

13. FLORIS and BENAVIDES are former FBI officials. FLORIS served as the Deputy Assistant Director and functional head of FITF from mid-2019 through mid-2022. BENAVIDES served as the Section Chief of FITF from mid-2019 through the 2020 election.

14. Although FITF was originally focused on combating foreign influence by Russia, its scope expanded to include foreign influence by other nation-state actors. As FITF's scope expanded in the leadup to the 2020 election, so did its size. In the beginning, FITF was a small task force focused on Russia, but in mid-2019, it became a standalone section with its own section chief: BENAVIDES. FITF, led by FLORIS and BENAVIDES, was tasked by the FBI with securing the 2020 election from foreign malign actors. FITF was disbanded in 2025.

15. As described in detail below, witness accounts and contemporaneous documents from December 2019 through September 2021 show that FLORIS and BENAVIDES knew about,

and were actively involved in, the FBI's investigations of Hunter Biden. For example, FITF hosted classified briefings for the agents and prosecutors on the Hunter Biden case in which FLORIS and BENAVIDES were participants.

16. In October 2020, both FLORIS and BENAVIDES worked on the FBI's internal and Congressional responses to reporting on the FBI's receipt of Hunter Biden's laptop, with FLORIS receiving, discussing, and passing along updates on the investigations through late 2021.

17. Hunter Biden was a recurring subject at FITF in briefings, emails, instant messages, and meetings, including internal discussion of whether information about him stemmed from Russian disinformation. According to an October 2026 interview of FBI Employee 1—who was involved in the oversight of the Hunter Biden investigations for the FBI's Criminal Division—personnel at FITF including FLORIS and BENAVIDES were in frequent communication with the Hunter Biden case teams. Information flowed in both directions; the case team would send FITF updates on their investigations and FITF would send information to the case team that FITF saw as relevant.

18. According to an October 2026 interview of an FBI Baltimore Assistant Special Agent in Charge ("ASAC"), herein referred to as FBI Employee 2, the FBI Baltimore Field Office brought the FITF into their investigations of Hunter Biden. FBI Employee 2 confirmed that FLORIS, BENAVIDES, and other members of the FITF had knowledge and awareness of their investigations and details of their investigations, including in relation to Hunter Biden's laptop.

19. FLORIS and BENAVIDES were involved in FITF's interactions with the Hunter Biden case teams. The following are some pertinent examples, although they are not intended to be exhaustive.

20. On August 14, 2020, FITF requested and held a follow-up call with the Hunter

Biden investigative team "to review/discuss the script for the defensive brief and discuss other relevant topics." A defensive briefing is a proactive, private security or counterintelligence awareness meeting aimed at protecting an individual from foreign influence or espionage. Ex. 1 (Transcribed Interview of Nicole Floris Before the H. Comm. on the Judiciary, 118th Cong. 25:3–9, 26:20–24 (July 19, 2023) ("Floris Tr.")). In this context, a primary goal of a defensive briefing is to warn the recipient of the brief that he or she may have been the subject of foreign disinformation.

21. The Baltimore FBI Special Agent in Charge, FBI Employee 2, the case agents, and three Assistant United States Attorneys from the District of Delaware, including the Criminal Chief, attended. The FBI officials who presented the classified material included FLORIS and BENAVIDES. After the presentation, the case team "raised no objections to the proposed defensive briefings" and asked FITF to run full intelligence-community traces on Hunter Biden and Hunter Biden's companies, to which the FITF agreed. It is unclear to whom the defensive briefings were to be directed.

> [redacted] On July 16, 2020, FBIHQ Money Laundering Unit, FBI Baltimore (FBI BA), and FBI New York were requested to participate in a classified discussion regarding defensive briefings, which was hosted by the FBIHQ Foreign Influence Task Force (FITF) and was held at a higher classification level. FITF provided background information, analysis, charts, and lists of individuals and entities, which included, but was not limited to, certain individuals and entities associated with captioned investigation. In summary, FBI BA was advised that certain

[redacted] On August 14, 2020, the FBIHQ FITF requested a secure conference call with FBI BA and USADE personnel, which was held at a higher classification. The purpose of the call was to review/discuss the script for the defensive brief and discuss other relevant topics. The FBIHQ participants who presented the classified material, included, but was not limited to:

DAD Nikki Floris
SC Bradley Benavides
SC [redacted]
A/SC [redacted]
A/SC [redacted]
UC [redacted]
DOJ Attorney, National Security Division

[redacted] Based on information that was presented, FBI BA and USADE raised no objections to the proposed defensive briefings and stated that the investigative team should have no further participation in the planning or content of these briefings. FBI BA also requested a complete and thorough USIC trace request for any/all information pertaining to captioned investigation. Therefore, FBI BA respectfully requests FITF-R submit the complete and thorough USIC trace request for any/all information pertaining to:

1) Robert Hunter Biden

22. After this call, FLORIS messaged the CID Public Corruption Unit Section Chief that she "had a cool call with baltimore and USAO." She then said, "looks like it's a yes to defensively briefing the folks." On August 18, 2020, BENAVIDES was one of the approvers for the opening of the "Type 3 assessment" under which Round River operated. A Type 3 assessment is used to identify, obtain, and use information about potential federal criminal activities or national security threats.

23. On September 23, 2020, FLORIS circulated a report written by United States Senators Ron Johnson and Charles Grassley, described below. The report detailed millions of

dollars in questionable financial transactions between Hunter Biden and his associates and foreign individuals. The morning the Johnson/Grassley report was released, FLORIS circulated it to multiple people within the FBI. FLORIS instant messaged the CID Public Corruption Unit Section Chief: "johnson/grassley report on ukraine dropped this am." She also emailed a link to the report to BENAVIDES with the subject "Ukraine report," writing: "Just dropped this am." FLORIS also emailed the CID Public Corruption Unit Section Chief the same link. Because the report was long, FLORIS included a summary that referenced an alleged $7 million bribe paid by the founder of Burisma, a Ukrainian natural gas producer, to officials serving under Ukraine prosecutor general Vitaly Yarema while Hunter Biden served on Burisma's board.

**From:** Floris, Nikki L. (CD) (FBI)
**Sent:** Wednesday, September 23, 2020 6:42 AM
**To:** [redacted]
**Subject:** Report

Per my red side IM: https://www.finance.senate.gov/imo/media/doc/HSGAC%20-%20Finance%20Joint%20Report%202020.09.23.pdf

It's long, so here's a summary:

# Johnson, Grassley Release Report on Conflicts-of-Interest Investigation

Hunter Biden was serving on Burisma's board (supposedly consulting on corporate governance and transparency) when Burisma owner Mykola Zlochevsky allegedly paid a $7 million bribe to officials serving under Ukraine's prosecutor general, Vitaly Yarema, to "shut the case against Zlochevsky." George Kent testified that this bribe occurred in December 2014 (seven months after Hunter Biden joined Burisma's board), and, after learning about it, he and the resident legal adviser reported this allegation to the FBI.

In addition to the over four million dollars paid by Burisma to Hunter Biden and his business partner, Devon Archer, for membership on the board, Hunter, his family, and Archer received millions of dollars from foreign nationals with questionable backgrounds.

24. On September 24, 2020, an FBI Section Chief emailed FLORIS, copying BENAVIDES, to set up a meeting on the Round River white paper. The Section Chief said the team was weighing which informants to close as sources and was "brainstorming on how we can utilize the network to send information of our choosing back upstream." FLORIS replied that she was "[l]ooking forward to the conversation!" She then hosted a "Round River Pre-Brief" in her office.

25. The next day, September 25, 2020, the Round River Initial Interim Report went to Counterintelligence Division executive management. The report lists both BENAVIDES and FLORIS among the eight officials who reviewed and approved it.

26. During an October 2026 interview, FBI Employee 1 confirmed that Round River was aimed at, among other things, scrutinizing informant intelligence relating to the Hunter Biden investigations as potential disinformation.

27. On October 14, 2020, the New York Post published its story on the Hunter Biden laptop, and both FLORIS and BENAVIDES assisted with the FBI's response to press inquiries the same day. FLORIS and BENAVIDES received an email from the FBI Cyber Division with the

subject "Ny post… morning answer?" and a question about whether the FBI had the laptop. The Office of Congressional Affairs also sent them and a FITF Unit Chief, FBI Employee 3, an email titled "SSCI Request – Hunter Biden Laptop." FLORIS answered that "CID is point on this matter" and copied CID management. A Director's Office media coordinator told BENAVIDES that at a tech-industry call that day, "most of the questions were about the news reports about a laptop and Burisma." When a FITF Unit Chief [FBI Employee 4] asked BENAVIDES whether FITF was tracking the laptop coverage, he replied: "Indeed...I've spoken to [initials of FBI Employee 1]," and "I would love to know if a copy exists, and was it provided to anyone…[initials of FBI Employee 1] did not know."

| | | |
|---|---|---|
| [redacted] | BRADLEY BENAVIDES | you guys are tracking the coverage of the laptop right? |
| BRADLEY BENAVIDES | [redacted] | Indeed...I've spoken to [redacted] |
| BRADLEY BENAVIDES | [redacted] | I would love to know if a copy exists, and was it provided to anyone... [redacted] did not know |
| [redacted] | BRADLEY BENAVIDES | Yeah |

28. On October 14, 2020, in the context of discussing the Hunter Biden laptop, BENAVIDES's Unit Chief, FBI Employee 3, emailed that he was "[o]n with Twitter now," referring to the Hunter Biden laptop story. FBI Employee 4 later provided a transcribed interview to the House Judiciary Committee during which she was admonished that false testimony could be prosecuted under 18 U.S.C. § 1001. During that testimony, she provided the following answers:

> Q. When the information was relayed to you following the Twitter call that the first agent had said the laptop was real, just to clarify, you knew prior to that conversation that the laptop was real. Is that correct?
>
> A. I did, yes.
>
> Q. But you don't recall when approximately you learned?
>
> A. I don't, sorry.
>
> Q. Sitting here today, do you know when the FBI first determined that the laptop was real?

A. I don't. I know that there is some information in the public record regarding when the FBI acquired the laptop, but I don't, sitting here, remember that date.

Q. Do you know who else at FITF knew that the laptop was real?

A. I don't actually. I would assume both my – yes, I would certainly say that Brad Benavides was aware.

29. The next day, on October 15, 2020, a FITF Assistant Section Chief, FBI Employee 5, told FLORIS that the criminal case was "being run out of CID, Branch II, Financial Crimes Section ([FBI Employee 6])." FLORIS replied that she needed to know "if i can confirm FBI in possession of laptop, as i believe the property receipt is in open source." She added that the "logical follow on question" would be what the FBI was doing with it. That evening, FLORIS forwarded a reporter's message about the seized laptop to FBI executive leadership and BENAVIDES. In that message, the reporter stated that NBC News "is going to report that the FBI is investigating whether the emails and other materials published by the New York Post are linked to a foreign intelligence operation designed to interfere in the election[,] [a]nd that's the reason the laptop and hard drive were seized by the FBI."

30. On October 16, 2020, BENAVIDES wrote, and FLORIS approved, additions to the FBI Director's talking points on the laptop for his call with Senator Mark Warner. The Office of Congressional Affairs' draft stated: "The most I can say is that the FBI is in possession of an item that we lawfully seized." BENAVIDES responded "This is good...you could add another if asked: Is the information we're seeing in the press about a laptop containing emails associated with Hunter Biden part of a Russia disinformation effort? I can see from the perspective of anyone consuming this story that they could be concerned this is a Russia disinformation effort similar to what the FBI, ODNI, and other agencies have warned against; however, the FBI has not made that

determination in this specific instance and as I stated before, I won't comment on investigations or investigative actions." He then wrote "Nikki, thoughts???" FLORIS responded "Looks good!"

> **From:** BENAVIDES, BRADLEY S. (CD) (FBI) <BSBENAVIDES@fbi.sgov.gov>
> **Sent:** Friday, October 16, 2020 1:58 PM
> **To:** [redacted]@fbi.sgov.gov>; FLORIS, NIKKI L. (CD) (FBI) <NLFLORIS@fbi.sgov.gov>
> **Subject:** RE: Warner Call Supplemental TPs for Director --- [redacted]
>
> [redacted]
>
> ====================================================
>
> This is good...you could add another if asked: Is the information we're seeing in the press about a laptop containing emails associated with Hunter Biden part of a Russia disinformation effort? I can see from the perspective of anyone consuming this story that they could be concerned this is a Russia disinformation effort similar to what the FBI, ODNI, and other agencies have warned against; however, the FBI has not made that determination in this specific instance and as I stated before, I won't comment on investigations or investigative actions.
>
> Nikki, thoughts???

> ===========================================================
>
> Looks good!

31. The same day, BENAVIDES asked the Hunter Biden case team for specifics on the laptop that he already knew existed. BENAVIDES messaged FBI Employee 2 (one line is a separate conversation with another FBI employee redacted for clarity):

| | | |
|---|---|---|
| [redacted] | BRADLEY BENAVIDES | Hey! |
| BRADLEY BENAVIDES | [redacted] | Per chance, could you shoot me the date on the property receipt re the laptop...when was that seized? |
| [redacted] | BRADLEY BENAVIDES | 12/9/2019 |
| [redacted] | BRADLEY BENAVIDES | Do we need to talk? |
| BRADLEY BENAVIDES | [redacted] | Ty |
| BRADLEY BENAVIDES | [redacted] | Any other computers and/or laptops...or just this one? |
| [redacted] | BRADLEY BENAVIDES | Only that one. |
| [redacted] | BRADLEY BENAVIDES | Whose asking? |
| BRADLEY BENAVIDES | [redacted] | The exploitation of the item, were the fruits shared w/ NY? |
| BRADLEY BENAVIDES | [redacted] | I'm asking |
| ALFRED WATSON | BRADLEY BENAVIDES | No. |
| [redacted] | | |
| [redacted] | BRADLEY BENAVIDES | What's going on? |
| BRADLEY BENAVIDES | [redacted] | I'm dotting I's... |
| [redacted] | BRADLEY BENAVIDES | Roger. |
| BRADLEY BENAVIDES | [redacted] | OCA had a few q's... |
| BRADLEY BENAVIDES | [redacted] | Are you certain that none of the emails or anything else from the exploitation weren't share w/ NY |
| [redacted] | BRADLEY BENAVIDES | I'll double check and get back with you. But, as far as I know they weren't. |
| BRADLEY BENAVIDES | [redacted] | Please...ty! |
| BRADLEY BENAVIDES | [redacted] | I now understand NY got their own, separate SW... |

32. During an October 2026 interview with FBI Employee 2, FBI Employee 2 expressed skepticism about why BENAVIDES was seeking this information.

33. On October 22, 2020, BENAVIDES sent an Outlook meeting invitation to FBI Employee 1—of the FBI's Criminal Division—entitled "To Discuss Laptop," which FBI Employee 1 accepted. They met in person at FBI headquarters. During the meeting, BENAVIDES, FBI Employee 1, and others discussed the Hunter Biden laptop in detail, including the source of the laptop and the contents of it. Per an October 2026 interview with FBI Employee 1, FBI Employee 1 was present when personnel from the FBI Criminal Division made clear during the meeting that the FBI was in possession of the contents of the laptop, that the laptop belonged to Hunter Biden, and that evidence relating to Hunter Biden was on the laptop. On October 27, 2020, BENAVIDES was copied on an email chain titled "FBI Baltimore: Hunter Biden Information." In that chain, DOJ's Public Integrity Section noted that it was "looping in FBI/FITF and [the National Security Division]."

| | |
|---|---|
| **m:** | [redacted] (CID) (FBI) <[redacted]@fbi.sgov.gov> |
| **ent:** | Thursday, October 22, 2020 5:35 PM |
| **To:** | BENAVIDES, BRADLEY S. (CD) (FBI) |
| **Subject:** | Accepted: To Discuss Laptop --- UNCLASSIFIED |

34. After the November 2020 election, BENAVIDES departed FITF, but FLORIS remained engaged with the Hunter Biden investigations.

35. On December 21, 2020, FBI Employee 2 sent FLORIS a report about an escort that Hunter Biden had failed to pay for sex. The report included allegations that she had been threatened by Hunter Biden, among others. In the email to FLORIS, FBI Employee 2 wrote: "Nikki – For info of FITF, the financial transaction noted in the complaint was verified by the investigative team." FLORIS forwarded the email to FBI Employee 5, adding "Per our chat last week."

FLORIS, NIKKI L. (CD) (FBI) <NLFLORIS@fbi.sgov.gov>
Monday, December 21, 2020 10:50 AM
[redacted]
FW: [redacted] 17 DEC 2020 Call Received From an Anonymous Female Based in Los Angeles --- UNCLASSIFIED//FOUO
17_DEC_2020_SIM_EXEC_SUM.docx; 17_DEC_2020.mp4

Per our chat last week.

Complainant reports that she received a text from RHB that she perceived as threat in which RHB said "Don't forget that I know where you are, you have an ankle bracelet and that the laptop was recording" Complainant further notes that she had intercourse with RHB in front of the laptop while facetiming with a third party (Complainant describes as a cam girl) who RHB knew.

Complainant reports that over a period of time and with much difficulty dealing with her bank (and RHB because he wanted the funds returned via Zell (PH) or in cash), that she was able to return the money to RHB's accounts.

36. Throughout 2021, Hunter Biden remained a regular topic between FLORIS and her FITF subordinates. For example:

a. On February 19, 2021, FBI Employee 4 asked FLORIS: "Do you want to chat Sportsman today?"

b. On February 25, 2021, FLORIS forwarded the "Sportman [sic] one pager" prepared for the Deputy Director to FBI Employee 3 and FBI Employee 5.

c. On March 4, 2021, FBI Employee 4 asked: "Can [FBI Employee 5] and I pop down and talk about that reporting and Sportsman?" The same day, FLORIS wrote to FBI Employee 5 saying "[FBI Employee 4] mentioned needing to chat about sportsman?" and they agreed to meet.

d. On July 21, 2021, FLORIS told FBI Employee 4: "i have a sportsman update from CID."

e. On September 9, 2021, FLORIS briefed the Assistant Director of the Counterintelligence Division on "potential obstruction charges on Gilliar . . . and

SPORTSMAN" and passed along source reporting that "SPORTSMAN met with YE (chairman of CEFC [China Energy]) three times in 2017."

f. On September 13, FBI Employee 4 updated her on specific investigative steps: "RE: SPORTSMAN – they will not be calling Gilliar until at least Wednesday." Gilliar refers to a former business associate of Hunter Biden who had a financial interest in CEFC China Energy.

## IV. FLORIS's and BENAVIDES's Respective and Independent False Testimony to Congress

37. In August 2019, Senator Grassley and Senator Johnson opened an investigation into potential conflicts of interest arising from the foreign business ventures of the family of then-Presidential candidate, Joseph R. Biden, Jr. Ex. 2 (Transcribed Interview of Bradley Benavides Before the H. Comm. on the Judiciary, 118th Cong. 69:6–12 (Sept. 28, 2023) ("Benavides Tr."). Those alleged conflicts of interest related to, among other things, Hunter Biden's role on the board of Burisma.

38. On August 6, 2020, FLORIS and BENAVIDES provided two separate defensive briefings to Senators Grassley and Johnson related to intelligence coordinated through the ODNI. Floris Tr. 23:13–24:1. During the briefings, FLORIS and BENAVIDES focused on potential Russian disinformation. Floris Tr. 28:20–29:6. When the House Judiciary Committee asked for specifics on the content of the defensive briefs during her transcribed interview, FLORIS testified that she could not get into specifics because the contents of the briefing were not FBI information—she directed the Committee to the ODNI. *E.g.*, Floris Tr. 28:15–19, 29:13–15.

39. On August 25, 2022, Senators Grassley and Johnson sent a letter to FLORIS and BENAVIDES requesting their appearance to testify regarding FITF and the defensive briefings. The letter referenced previous attempts to obtain records and briefing appearances on August 12,

2020, May 3, 2021, July 25, 2022, and August 11, 2022. According to the Senators, they wanted to interview FLORIS and BENAVIDES "to explain the FBI's interference in the senators' Hunter Biden investigation."

40. To investigate the FBI's handling of the Hunter Biden investigations and related issues, the House Judiciary Committee interviewed FLORIS and BENAVIDES on July 19, 2023, and September 28, 2023, respectively. *See* Floris Tr. 3:2–4 ("Chairman Jordan has requested this interview as part of the committee's oversight of the Federal Bureau of Investigation."); Benavides Tr. 3:1–4 (interview requested "as part of the committee's investigation of how and the extent to which the executive branch has coerced and colluded with companies and other intermediaries to censor speech").

41. On July 19, 2023, starting at around 10:00 a.m., FLORIS gave a transcribed interview to the House Judiciary Committee on the above issues. The interview took place at the Rayburn House Office Building, which is located within the District of Columbia. The interview focused on, among other things, the extent of FITF's involvement in connection with the FBI's investigations into Hunter Biden.

42. At the beginning of the interview, Committee staff informed FLORIS that there was "an official court reporter taking down everything we say to make a written record" and asked that she "answer . . . questions in the most complete and truthful manner as possible," telling her that she should ask for clarification if needed. Floris Tr. 4:12–25. FLORIS also was warned that she was required to "answer questions from Congress truthfully," including questions from staff. Floris Tr. 5:7–12. FLORIS acknowledged that she understood that "[w]itnesses that knowingly provide false testimony could be subject to criminal prosecution for making false statements under 18 U.S.C. Section 1001" and said there was no reason she could not provide truthful answers.

Floris Tr. 5:13–19. Indeed, FLORIS later acknowledged the importance of being transparent with Congress. She testified:

> But as I said several times in this discussion, I think it's extremely important for us to lean in and be transparent with the elected officials. It is our job. The FBI is the action arm of the [intelligence community], and in my opinion, we owe it to our elected officials to be as forward-leaning as we can in sharing information explicit to them.

Floris Tr. 149:6–9.

43. FLORIS testified about her role at FITF including that, as the head of FITF, she was the FBI's election security lead for the 2020 Presidential election. Floris Tr. 8:5–12. She also testified that she understood what FITF was working on at any given time "for the most part" and spoke with BENAVIDES on a daily basis. Floris Tr. 11:14–18. FLORIS then testified on a number of matters relevant to the Committee's inquiries, as outlined below.

44. FLORIS testified that her only involvement in the Johnson/Grassley defensive briefings was delivering a message on behalf of ODNI. After testifying that she provided the briefings, Floris Tr. 23:18–24, she explained that any member of the intelligence community can nominate intelligence to be considered for defensive briefings, Floris Tr. 24:19–23, 84:3–5. She explained that when intelligence notifications take the form of private, defensive briefs, the notification comes from the FBI. Floris Tr. 25:3–9. That is, "even if it's not FBI information, FBI was still the face and still the responsible entity for delivering that defensive briefing." Floris Tr. 25:8–9. In this case, FLORIS testified that the FBI was not the nominating entity for the information, so she did not feel comfortable going into specifics on it. Floris Tr. 84:5–10. She explained that she "would defer to the ODNI" on specifics because "ODNI owns this whole process" and "ODNI took lead, just given their role, in drafting the script" for the defensive

briefings. Floris Tr. 27:4–10. FLORIS testified that FBI seldom made changes to the defensive briefing scripts, "unless there was like a glaring error or something." Floris Tr. 27:25–28:4.

45. When asked specifically if the defensive briefing related to Hunter Biden, FLORIS testified that she could not "go into those specifics" because it was "not FBI information." Floris Tr. 29:7–15. When asked if she was familiar with the Johnson/Grassley investigation into Hunter Biden, she said that she was not:

> Q. So are you familiar with Senator Grassley and Johnson's joint efforts to investigate Hunter Biden's overseas dealings and any potential connections to then-Vice President Biden?
>
> A. Not in any level of detail.
>
> Q. But you're familiar they were conducting this investigation?
>
> A. Not at that time. I know it now because it's somewhat in the media, but that's the extent of my knowledge.
>
> . . .
>
> Q. Were you aware that in August 2019, Senators [sic] Chuck Grassley and Senator Ron Johnson opened an investigation into conflicts of interest involving the Biden family's foreign business ventures while Joe Biden was Vice President?
>
> A. No.
>
> Q. Have you since become aware of it?
>
> A. High level, mainly in this conversation.
>
> Q. Does that investigation in any way relate to your role at the FBI?
>
> A. No.
>
> Q. Are you aware that upon concluding their investigation, the staff of the Senate Finance Committee and the Senate Homeland Security and Governmental Affairs Committee issued a report in September of 2020?
>
> A. No.

. . .

Q. And to be clear, have you ever reviewed or seen this report prior to today?

A. Not to my knowledge.

Floris Tr. 32:10–16, 156:9–156:17, 157:23–24.

46. FLORIS was asked repeatedly about her—and FITF's—involvement in the FBI's investigations into Hunter Biden. In no uncertain terms, she testified that, to her knowledge, FITF had no involvement in the investigations or awareness thereof. For example:

Q. Did you have any involvement in the Hunter Biden investigation?

A. I did not.

Floris Tr. 13:22–23. She was asked repeatedly whether she was involved in *any* discussions at FITF about Hunter Biden whatsoever:

Q. Was there ever a discussion at the FITF about Hunter Biden?

A. No. At least not with me. And again, there's a whole team below me, so whether or not conversations happened, I don't know, but I personally did not have any conversations.

Q. Oh, yeah. No, I understand people can interact and you don't have personal knowledge of that. But just so I drill a fine point on it, as you testified to us today, you have no personal knowledge of Hunter Biden ever being the subject of any discussion at the FITF while you ran that entity?

A. Correct.

Floris Tr. 43:2–10.

47. FLORIS also was asked specifically about particular FBI investigations into Hunter Biden. She disclaimed involvement. For example, when asked about a Daily Beast article that referenced Hunter Biden's laptop, the following exchange occurred:

Q. So they focus on this hard drive or the computer that Mr. Giuliani is supposed to be using to influence the election and

> they use his comments to say he was trying to influence the election and he is buddies with somebody in Ukraine. So how long did the FBI have that laptop prior to the 2020 election, do you know?
>
> A. I don't know. I don't know what laptop the article was referring to.
>
> Q. It's the one that Hunter Biden left with—and it's referred to in this article—with a computer repairman in Connecticut.
>
> A. I—I don't have any details about the laptop.
>
> . . .
>
> Q. So let me—let me give you an example. So—and I'm going to use the hypothetical that a Presidential candidate's son has left a laptop in a repair shop, and on that laptop is incredibly damaging material to the President's—that Presidential candidate, or some would say it is damaging. Comes into the hands of the FBI, and somebody else publicly says, you've got the laptop, it's incredibly damaging, and the information is valid and good and belongs to this individual. Are you guys going to—what are you going to do at that point if that—with that laptop?
>
> A. I can't speak to that, sir, what we would do with that laptop. You know, I don't have any knowledge of said laptop. I can't talk hypothetically about what we would have done or not have done with that laptop.

Floris Tr. 94:7–15, 95:24–96:8. When asked about the Hunter Biden/Burisma allegations, FLORIS gave similar responses. For example:

> Q. Directing your attention to page 5 [of the Johnson/Grassley report]. The second full paragraph, it reads, quote, Hunter Biden was serving on Burisma's board, . . . when . . . [the founder of Burisma] allegedly paid a $7 million bribe to officials serving under Ukraine prosecutor general Vitaly Yarema . . . . Were you aware of this allegation or have you since become aware of this allegation prior to just now?
>
> A. No.

Floris Tr. 158:12–24.

48. On September 28, 2023, BENAVIDES gave a transcribed interview to the House Judiciary Committee on the above issues. Benavides Tr. 1:18–24. The interview took place at the Rayburn House Office Building, which is located within the District of Columbia. The interview focused on, among other things, the extent of FITF's involvement in connection with the FBI's investigations into Hunter Biden.

49. At the beginning of the interview, Committee staff informed BENAVIDES that there was "an official court reporter taking down everything we say to make a written record" and asked that he "answer . . . questions in the most complete and truthful manner possible," telling him that he should ask for clarification if needed. Benavides Tr. 4:4–5, 5:6–9. BENAVIDES also was warned that he was required to "answer questions from Congress truthfully," including questions from staff. Benavides Tr. 5:19–6:1. BENAVIDES acknowledged that he understood that "[w]itnesses that knowingly provide false testimony can be subject to criminal prosecution for perjury or for making false statements under 18 United States Code, section 1001" and said there was no reason he could not provide truthful answers. Benavides Tr. 6:1–9. BENAVIDES was careful in how he testified, *e.g.*, Benavides Tr. 30:7–10; *see also* Benavides Tr. 127:12–13 ("I am trying to be as precise with you as possible."), and frequently asked for clarification or said he did not recall certain things happening.

50. A primary focus of BENAVIDES's testimony concerned the extent of FITF's involvement in connection with the Hunter Biden laptop investigation. BENAVIDES, in no uncertain terms, disclaimed any contemporaneous knowledge of the Hunter Biden laptop. For example:

> Q. Are you familiar with the October 14th, 2020, New York Post story regarding Hunter Biden's laptop?
>
> A. Only in the—from the prep material. I read through it.

Q. Do you recall if you were aware of it in October of 2020, when the story came out or shortly thereafter?

A. I don't know if I would have gotten it from the story, but I was aware of a Hunter Biden laptop narrative that was out in the public domain in 2020.

Q. And, to your understanding, what was that Hunter Biden laptop narrative?

A. My understanding, and I'll be honest, some of this came from 2 days ago. I was on Wikipedia, anticipating what might be asked. There was a purported laptop dropped off at a repair shop attributed to Hunter Biden.

Q. And, to your knowledge, is the FBI in possession of that laptop?

A. Only because of the Wikipedia article, my understanding is, according to that article, the FBI is in possession of the laptop.

Benavides Tr. 146:12–147:1.

51. BENAVIDES repeatedly was asked about the Hunter Biden laptop and repeatedly gave the same answer:

Q. When did you learn that there was an ongoing criminal investigation related to the laptop?

A. The Wikipedia page.

Q. In prep for today?

A. Yes.

Q. So you had no knowledge during your tenure at the FBI?

A. Of an investigation related to the laptop?

Q. Yes.

A. No.

Benavides Tr. 162:23–163:6.

52. BENAVIDES later was asked the same question, and this time he doubled down on his lack of contemporaneous awareness:

> Q. Okay. You mentioned that at some point—I think you said, when you were reading a Wikipedia article, you came to learn that there was an ongoing criminal investigation that related to a laptop?
>
> A. I don't recall that from the Wikipedia. I was made aware per the Wikipedia article that the FBI had taken possession of a laptop circa December of 2019.
>
> Q. Okay. You didn't have that knowledge from your role in the FBI?
>
> A. Absolutely not.
>
> . . .
>
> Q. Okay. I just want to clarify, because some of the questions were just so broad and so hypothetical. Like, let's be really specific. Do you have any knowledge that the FBI has an ongoing criminal investigation related to a laptop purported to belong to Hunter Biden?
>
> A. I do not have firsthand knowledge of that.
>
> Q. Okay. Do you have any knowledge outside of the Wikipedia or media articles that you would have read?
>
> A. No.
>
> Q. Nothing specific to your time in the FBI?
>
> A. No.
>
> Q. And you never had that kind of knowledge, is that fair to say, that was specific to your role in the FBI?
>
> A. In the investigation into a laptop, no.

Benavides Tr. 171:19–172:18.

53. The most that BENAVIDES would say about the laptop was that he remembers being asked by the Executive Assistant Director for National Security—in hypothetical and

perhaps "rhetorical" terms, Benavides Tr. 155:24—whether "the Russians had the sophistication, the capabilities to potentially insert a laptop purported to be associated with Hunter Biden." Benavides Tr. 147:6–148:14. BENAVIDES responded that it was "conceivable that something like [that] could happen," Benavides Tr. 148:16–20, and "that was the end of the conversation," Benavides Tr. 155:23–156:1. But BENAVIDES otherwise denied having any other conversations about the laptop at the FBI:

> Q. Prior to your conversation with [the Executive Assistant Director for National Security], did you have any discussions with anyone in the government regarding the FBI's possession of the laptop?
>
> A. I would not have discussed anything about the laptop within the government. If I knew that the FBI had possession of it, that would have been outside of FITF.
>
> Q. What do you mean by that?
>
> A. Meaning that there would not have been a FITF part of our mandate. Knowing that the FBI had the laptop, the FITF would not have had the laptop. I would have known that the FITF had the laptop, in other words.
>
> Q. Sure, sure. To your understanding, which division would have had the laptop?
>
> A. Likely the Criminal Division.
>
> Q. Did you have any discussions with anyone from the Criminal Division regarding the FBI's possession of the laptop?
>
> A. I did not.

Benavides Tr. 150:16–151:6.

54. BENAVIDES also was asked about the allegation that FITF communicated with social-media companies about the Hunter Biden laptop:

> Q. Do you know if FITF was being asked by the social media companies the day the story broke whether the FBI has the laptop?

A. As part of my prep material, I know that question was asked to [FBI Employee 4], I believe.

Q. At the time[] you were section chief of FITF did you know that?

A. Not at the time I was section chief of FITF, no. Apologies.

Benavides Tr. 152:8–13.

### V. FLORIS's and BENAVIDES's Respective False Testimony to Congress Independently and Materially Frustrated the Committee's Investigation

55. In connection with this investigation, the FBI has obtained information from a Congressional staffer who oversaw the 2023 House Judiciary Committee interviews of FLORIS and BENAVIDES.

56. The staffer confirmed that he viewed FLORIS's statements concerning her involvement in and discussions of the Hunter Biden investigations as materially untrue. The staffer also confirmed that he viewed BENAVIDES's statements on his awareness of and involvement in the Hunter Biden investigations as materially untrue. The staffer further stated that the Committee relied on the truthfulness of FLORIS's and BENAVIDES's answers, and as a result, their respective false answers influenced the Committee's investigation significantly, including by thwarting investigative follow-up interviews and subpoenas. For example, had FLORIS answered the Committee's questions concerning her awareness of discussions relating to Hunter Biden at the FITF truthfully, the Committee would have pursued all relevant information about those communications. Had BENAVIDES been truthful about his involvement in the Hunter Biden investigations, the Committee would have sought additional documents and testimony in furtherance of its investigation.

57. In an October 2026 interview, FBI Employee 1 stated that, if FLORIS testified that she had no discussions about an investigation into Hunter Biden while she was at FITF, that

testimony would have been inaccurate. He further stated that he had routine and regular discussions with FLORIS regarding the investigations into Hunter Biden.

58. In the same October 2026 interview, FBI Employee 1 stated that, if BENAVIDES had testified to having no awareness of the Hunter Biden laptop while he was at FITF, that testimony would have been inaccurate. He further stated that he sat in a room with BENAVIDES when personnel from the FBI's Criminal Division and the FITF talked about the laptop. He further stated that he spoke with BENAVIDES about reviewing material from the laptop that was in the FBI's possession.

59. After acknowledging that she could be prosecuted under 18 U.S.C. § 1001 for providing a false statement to Congress, FLORIS testified that she had no involvement in the Hunter Biden investigations. In reality, she was in communication with the case team for over a year during which she both sent and received information about Hunter Biden. FLORIS testified that she knew nothing about the Hunter Biden laptop. In reality, FLORIS coordinated the FBI's response to news articles about the laptop in real time. FLORIS agreed that she had "no personal knowledge of Hunter Biden ever being the subject of any discussion at the FITF" while she was there. In reality, FLORIS personally participated in conversations about Hunter Biden, including many that were in writing. FLORIS testified that she had no contemporaneous knowledge of the Johnson/Grassley investigation report. In reality, FLORIS circulated the report the morning that it was released, along with a summary. FLORIS testified that she knew nothing about an assessment to discredit the Hunter Biden investigations, even though she approved the Round River Initial Interim Report and participated in conversations about it. Individually and collectively, these false statements allowed her to avoid further questioning from the Committee about the then-President's son, which undermined a duly convened Congressional committee from

exercising oversight of the Executive Branch. Namely, FLORIS's false testimony was intended to influence, obstruct, and impede a proceeding of the United States House of Representatives Committee for the Judiciary.

60. BENAVIDES's testimony followed a similar pattern. After acknowledging that he could be prosecuted under 18 U.S.C. § 1001 for providing a false statement to Congress, BENAVIDES testified that he knew about the New York Post article regarding Hunter Biden's laptop "[o]nly in the—from the prep material." In reality, BENAVIDES extensively discussed the laptop story the day it broke. BENAVIDES further testified that he did not know that FITF was asked by social media companies whether FBI had the laptop on the day the New York Post story broke. In reality, BENAVIDES was included on emails while his subordinate was on the phone with Twitter. BENAVIDES even said that his awareness of the FBI's possession and investigation of a laptop purported to belong to Hunter Biden was "[o]nly because of the Wikipedia article" he read in preparing for his testimony. In reality, BENAVIDES was in communication about the laptop over a period of days including—in a fashion that demonstrated deeper knowledge—with the ASAC in charge of the investigation to confirm details about the FBI's receipt and exploitation of the laptop. This was confirmed by BENAVIDES's own subordinate during her interview before the Committee, when she said she "would certainly say that Brad Benavides was aware" that the laptop was real. And when BENAVIDES was asked whether he knew while he was at the FBI that "the FBI had taken possession of a laptop circa December of 2019," he replied: "Absolutely not." In reality, BENAVIDES was familiar with the investigations and the FBI's possession of the laptop, as demonstrated by the fact that BENAVIDES confirmed the date of receipt of the laptop with the ASAC in charge of the investigation.

61. BENAVIDES testified that he had no conversations with anyone from the FBI's Criminal Division about the FBI's possession of the laptop. In reality, he organized a meeting with FBI Employee 1, an agent involved in overseeing the Hunter Biden investigations from the Criminal Division, during which they discussed the laptop. That was only one of many conversations BENAVIDES had with FBI Employee 1 about the Hunter Biden laptop and investigations. Like FLORIS, BENAVIDES's false testimony allowed him to avoid further questioning from the Committee about the then-President's son, which undermined a duly convened Congressional committee from exercising oversight of the Executive Branch. Namely, BENAVIDES's false testimony was intended to influence, obstruct, and impede a proceeding of the United States House of Representatives Committee for the Judiciary.

62. I submit that this affidavit supports a finding of probable cause that FLORIS and BENAVIDES have made false statements to Congress in violation of 18 U.S.C. § 1001(a)(2) and have obstructed and attempted to obstruct a Congressional proceeding in violation of 18 U.S.C. § 1505.

63. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

____________________________
BRYAN WITT
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to me ______ day of October 2026.

______________________________________
HONORABLE ZIA M. FARUQUI
United States Magistrate Judge
United States District Court for the District of Columbia